In re **BUD LONG CHEVROLET, INC.**, Debtor.

**Bankruptcy No. 7–83–00021 MA.**

United States Bankruptcy Court,
D. New Mexico.

April 26, 1984.

John C. Wheeler, Albuquerque, N.M., for debtor.

Walter L. Reardon, Jr., Albuquerque, N.M., trustee.

Gregory Griego, Albuquerque, N.M., for GMAC.

Terry D. Farmer, Albuquerque, N.M., for First National Bank of Belen.

## MEMORANDUM OPINION

MARK B. McFEELEY, Bankruptcy Judge.

This matter came before the Court upon the motion of General Motors Acceptance Corporation (GMAC) and First National Bank of Belen (FNB) to lift the automatic stay. GMAC and FNB are both secured creditors of the debtor, Bud Long Chevrolet, and claim a security interest in the equipment and inventory of the debtor. By agreement of the parties the trustee has sold the collateral, and the claims of GMAC and FNB have attached to the fund of approximately $47,000.00 which resulted from the sale of the collateral.

I. Facts

Based upon the evidence and exhibits admitted at trial, the Court makes the following findings of fact:

1. The debtor, Bud Long Chevrolet, Inc. was originally incorporated as Mountainair Chevrolet, Inc. That corporate name was later changed to Bud Long, Chevrolet, Inc., in compliance with the requirements of General Motors Corporation.

2. The debtor obtained a loan in the amount of $225,000.00 from FNB to finance purchase of the dealership. That loan was secured by a security interest in all inventory, equipment, fixtures, furniture and furnishings of the dealership. The security agreement and financing statement reflecting the loan and security interest were filed on April 23, 1981.

3. The security agreement filed April 23, 1981, contained a future advances clause.

4. Prior to the granting of the loan by FNB, the bank's vice-president, James F. Atwood, had discussions with Mr. A.C. Morton of GMAC about the ability of GMAC to floor plan the vehicle inventory of what was then Mountainair Chevrolet. FNB could not advance the funds necessary to finance the vehicles, and wanted assurance that the financing would be available through GMAC. Through Mr. Morton and its dealings with Mr. Long and FNB, GMAC was aware that the debtor was then incorporated as Mountainair Chevrolet, Inc.

5. On or about June 5, 1981, documents were filed with the New Mexico Corporation Commission which amended the debtor's articles of incorporation to change the name of Mountainair Chevrolet to Bud Long Chevrolet, Inc.

6. On or about July 1, 1981, the debtor and GMAC entered into a loan agreement and wholesale security agreement, the debtor signed a note to GMAC in the amount of $3,000,000.00 and GMAC and

the debtor executed and filed a financing statement reflecting the transaction.

7. The description of the collateral in each of the documents executed by the debtor and GMAC were different. The GMAC loan agreement contemplates "personal property and other property acquired by the debtor"; the wholesale security agreement describes as collateral new and used vehicles as owned or acquired, and proceeds therefrom. The financing statement shows as collateral "motor vehicles, trailer and semi-trailers, and accessories; and the replacement parts for any of these . . . ."

8. The financing statement of GMAC was filed of record on July 22, 1981.

9. On October 8, 1982, the debtor and FNB entered into an additional loan agreement. The $500,000.00 loaned at that time incorporated the unpaid balance of the April 1981 note.

10. A new security agreement was entered into which added the real estate of the debtor as collateral, and the debtor executed a mortgage in favor of FNB.

11. On November 26, 1983, FNB extended further credit in the form of a revolving credit note to the debtor and filed another security agreement, securing amounts loaned by all tangible and intangible property of the debtor.

12. In January of 1983, the debtor filed a petition under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101, *et seq;* subsequently the case was converted to a Chapter 7 proceeding.

13. The debtor is in default on all notes to GMAC and FNB.

## II. DISCUSSION

There are three issues raised by the facts as set forth above. The first in the order of priority of the GMAC and the financing statements FNB, based on the documents filed. Second, is the effect, if any, of the change of name by the debtor. Finally we must consider what collateral is secured to each of the parties in this proceeding.

### A. *ORDER OF PRIORITY OF SECURED PARTIES*

As found above, the first financing statement and security agreement of FNB were filed on April 23, 1981. That security agreement by its terms secured payment of the $225,000.00 note executed by the debtor, and extended to secure payment of any funds advanced in the future. This Court has previously ruled that where a "future advances" clause exists in a properly filed financing statement or security agreement, that is sufficient notice to any party of the present or future security interest in the collateral named in the financing statement. *Waterfield v. Burnett* (In re Burnett) 21 B.R. 752, 754 (Bkrtcy.D.N.M.1982). GMAC does not dispute the general rule that such a future advances clause would, under normal circumstances, protect FNB's first priority position. However, GMAC urges that it is possible, through a pattern of conduct, to show that there is no intent that an earlier-filed security agreement should apply to a later loan, and that where that is the case the earlier filed security agreement will not create a first priority for that creditor as to the funds later advanced.

GMAC cites three cases as support for the theory that conduct can "waive" a priority in collateral. Two must be removed from application in the instant case because in those cases the financing statement and security agreements in question contained no future advance clause. These are *Coin-O-Matic Service Co. v. Rhode Island Hospital Trust Co.*, 3 U.C.C.Rep. 1112 (R.I.Super.Ct.1966) and *Texas Kenworth Co. v. First National Bank of Bethany*, 564 P.2d 222, 21 U.C.C.Rep. 1521 (Okl.1977). Certainly where there is no future advance clause it is a simple matter to find no intention that future advances be secured by the collateral in the original agreement. In the instant case, however, the language in the security agreement as to future advances is clear. The Court, and other creditors are not left to guess at ambiguous language. Consequently, *Coin-O-Matic* and *Texas Kenworth* are not applicable.

The third case cited by GMAC is *In re Hagler* 10 U.C.C.Rep. 1285 (Bankr.E.D. Tenn.1972). In *Hagler* the first creditor, who had a filed and perfected security agreement which did contain a future advances clause, was paid in full by a second creditor when the second creditor made its own loan to the debtor and filed its own security agreement. Although the first creditor was paid in full, neither the second creditor nor the debtor demanded that the first security agreement be released. Sometime later, the first creditor made a new loan to the debtor, relying on the first security agreement. The Bankruptcy Court applied Tennessee law, which required that, when an obligation is paid in full, a creditor must release its security agreement. Because the first creditor was paid in full at the time the second creditor filed its security agreement, and there was a space of time when the agreement secured no obligation of the debtor, the first security agreement was treated as if it had been withdrawn, as the law required. The Court found the first security agreement invalid not through conduct of the parties but through operation of law upon a factual situation which does not exist in the instant case. Consequently, *Hagler* will not stand as authority for invalidating the April 1981 security agreement of FNB.

Finally, we observe that in the instant case the evidence on the record does not support a finding of conduct which would indicate a lack of intent to apply the first security agreement to later advances. The October 1982 security agreement and mortgage added collateral while the note increased the amount owed to FNB. This indicates no more than a desire to add to collateral already pledged to FNB to cover the additional sums advanced. The November security agreement repeated the security interest in equipment, fixtures, inventory etc., but there was no evidence of any sort to indicate that this was intended by FNB or the debtor to invalidate or supercede the first security agreement. This Court could as easily conclude that the security was repeated out of an over-abundance of caution by FNB—a shotgun approach to secured transactions. The principles of equity which govern the Uniform Commercial Code, N.M.S.A. § 55-1-103 (1978), will not allow this Court to find on such a dearth of evidence that what might be merely an exercise of caution could result in the loss of the secured status FNB was attempting to protect.

Accordingly, the Court concludes that the security agreement of FNB filed April 23, 1981, gave FNB a first priority in the fund which resulted from the sale of the collateral.

## B. EFFECT UPON PRIORITIES OF THE CHANGE OF THE CORPORATE NAME OF THE DEBTOR

GMAC has urged that because the April 1981 security agreement listed the debtor as "Mountainair Chevrolet, Inc." it became "seriously misleading" once the debtor changed its name and therefore did not serve to give sufficient notice of FNB's security interest. N.M.S.A. § 55-9-402(5). The argument falls short for two reasons. First, a financing statement is sufficient in New Mexico even if it fails to give *any* name for a debtor. N.M.S.A. § 55-9-402(1). The debtor's address and mailing address is required, and there has been no allegation that the financing statement was insufficient in that respect. Secondly, it is clear from the evidence presented at the trial in this matter that GMAC knew of the debtor's first corporate name and of the intention of FNB to advance a substantial amount of money to the debtor. GMAC should not, indeed *could* not, have been misled by the security agreement filed by FNB. Consequently, FNB's first priority will not become "unperfected" for failure to file a new security agreement and financing statement.

## C. COLLATERAL SECURED TO EACH OF THE PARTIES

GMAC has never argued that FNB's security interest fails due to an inadequate description of the inventory and equipment at issue. Indeed, the lists at-

tached to the security agreement are specific and extensive and the Court holds that these are more than sufficient under the provision of 55–9–402(1) *Mogul Enterprises v. Commercial Credit Bus. Loans, Inc.* 92 N.M. 215, 585 P.2d 1096 (1978); *see also, Waterfield v. Burnett, supra,* 21 B.R. at 754. However, the descriptions in the several documents surrounding GMAC's transactions with the debtor create some confusion as to which property secures their loan. As stated above, the loan agreement seemingly contemplates that a security interest will be granted in all of the property acquired for the debtor's business. However, the financing statement confines tangible collateral to vehicles, accessories and replacement parts, and the wholesale security agreements state that the security consists of:

> new vehicles held for sale or lease and used vehicles acquired from manufacturers or distributors and held for sale or lease, and all vehicles of like kinds or types now owned or hereafter acquired from manufacturers, distributors or sellers by way of replacement, substitution, addition or otherwise and all additions and accessions thereto and all proceeds of such vehicles including insurance proceeds. (GMAC Exhibit C)

New Mexico law requires that where there is a conflict between the financing statement and the security agreement, the security agreement prevails, and a financing statement which goes beyond the scope of the security agreement has no effect except to the extent of the security agreement. *Jones & Laughlin Supply v. Dugan Production Corp.,* 85 N.M. 51, 508 P.2d 1348 (Ct.App.1973). Under *Jones* external evidence will not serve to augment a security agreement. "[a] security agreement is effective according to *its* terms. A security interest is not effective against third parties unless the debtor has signed a security agreement which contains a description of the collateral. *Id.* 85 N.M. 54[, 508 P.2d 1348".] The *Jones* court goes on to state that even though a financing statement would put third parties on notice to inquire into a creditor's security interest,

that will not serve to benefit that creditor if the security agreement does not cover the disputed items. *Id.*

█ In the instant case, the security agreement signed by the debtor and GMAC gives GMAC a security interest in new and used vehicles and the proceeds therefrom. The items of inventory and equipment sold by the trustee to create the funds at issue do not appear in even the most contorted reading of that security agreement. Additionally even the loan agreement, if it could be used to supplement the security agreement, would not serve to sufficiently describe the collateral, since the description "all personal property" was found in *Mogul Enterprises, supra,* to be insufficient as a description of the inventory of the debtor. *Id.,* 92 N.M. at 216–217, 585 P.2d 1096. Accordingly, the Court must conclude that under New Mexico Law the terms of GMAC's security agreement will not serve to give GMAC a security agreement in the personal property, parts inventory, furniture, furnishings, fixtures or equipment sold by the trustee.

### III. CONCLUSIONS

In light of the holdings set forth above, this Court holds that FNB is entitled to the net proceeds of the auction of personal property, parts inventory, furniture, fixtures, furnishings and equipment sold at auction by the trustee.

This memorandum constitutes findings of fact and conclusions of law. Bankruptcy Rule 7052.

An appropriate order shall enter.