**In re FLORES DE NEW MEXICO, INC.,**
**Employer ID No. 13–3324752 and State**
**Tax ID No. 02–046825003, Debtor.**

**FLORES DE NEW MEXICO,**
**INC., Plaintiff,**

**v.**

**BANDA NEGRA INTERNATIONAL,**
**INC., Defendant.**

**Bankruptcy No. 11–89–01033 M L.**
**Adv. 90–0144 M.**

United States Bankruptcy Court,
D. New Mexico.

March 8, 1993.

Holt Guysi, Albuquerque, NM, for plaintiff.

Arthur A. Greenfield, Albuquerque, NM, for defendant.

## MEMORANDUM OPINION

### MARK B. McFEELEY, Chief Judge.

This matter came before the Court for trial on the merits. Having considered the testimony of witnesses, the arguments of counsel, the applicable case law, the exhibits and memoranda of law submitted by the parties, and being otherwise fully informed and advised, this Court finds that the value of the assets auctioned is $900,000, which was the price paid for those assets by the successful bidder at auction. The Court finds that Banda Negra holds a valid perfected security interest in the prefabricated office building and the computer system. The Court finds that Banda Negra failed to properly perfect its security interest in the rose bushes. The Court further finds that Banda Negra failed to perfect its security interest in Flores' accounts receivable.

### FACTS

Flores was organized as a floriculture operation with its facilities in Las Cruces, New Mexico. It subleased twenty-eight acres from the New Mexico State University Foundation, Inc., (the "University") and placed ten of those acres under greenhouse. Flores' primary product was cut roses. It also produced other types of cut flowers, as well as container grown plants. As a rose producer, Flores had approximately 60,000 rose bushes contained in three of the greenhouses. The rose bushes were planted in the ground and had relatively extensive root systems. The remaining seven greenhouses were used for growing other types of cut flowers and for the production of container grown plants.

On or about March 8, 1988, Flores entered into an agreement with Banda Negra whereby Banda Negra loaned $1,100,000 to Flores. The loan was to be secured by Flores' assets. Flores executed and delivered to Banda Negra a loan agreement and a security agreement, to secure the debt.[1] U.C.C. financing statements naming Flores as debtor and Banda Negra as secured party, and listing the collateral securing the loan were filed with the Secretary of State of New Mexico on April 18, 1988, bearing No. 880418086, and with the clerk of Dona Ana County on April 19, 1988, bearing No. 726. The description of the collateral on each financing statement was identical to the description contained in the security agreement.

On June 2, 1988, a U.C.C. financing statement, naming Flores as debtor and Banda Negra as secured party, covering accounts receivable and proceeds of such collateral was filed with the clerk of Dona Ana County, bearing No. 937. On June 6, 1988, a U.C.C. financing statement covering the same collateral was filed with the Secretary of State, bearing No. 880606096. No separate security agreement was executed between Flores and Banda Negra regarding the accounts receivable or their proceeds.

On April 12, 1989, Flores filed a voluntary petition under Chapter 11 of the Bankruptcy Code. On September 8 and 14, 1989, Flores filed motions to sell property outside the ordinary course of business free and clear of liens and other interests, and this Court entered its order authorizing

---

1. The Security Agreement created a security interest in the following goods and chattels:
 1. *Greenhouses:* 10 greenhouse structures consisting of Packer Plada, Ltd., pre-fabricated, galvanized steel structures 413 ft. × 105 ft. × 13 ft. on concrete column foundations, including 21 exhaust fans (48"), cooling pads 413 ft. × 5 ft. × 4", and NEPCO NB–400 gas fired unit heaters. 6 such greenhouse structures with polyethylene covers of double layer roofs and 4 such greenhouse structures with corrugated fiberglass covers and shade cloths, and Metafim dripper/sprinkler systems.
 2. *Warehouse:* Pascoe pre-engineered metal building 70 ft. × 120 ft. 21 ft. attached to concrete pad.
 3. Refrigeration coolers manufactured by Bally covering total warehouse floor space of 60 ft. × 19 ft.
 4. Tractors:
 a. L4150 Kubota 50 h.p. 4–wheel drive ID# 0825
 b. B6200 Kubota 15 h.p. 4–wheel drive ID# 0465
 c. Bobcat 16.5 h.p. 10 # 2155
 d. *Howard Rotovator with bed shaper*
 5. 1986 Honda Accord—4 cylinder/4 door ID#JHMBA7438GC092789
 6. Various motors, tanks, pumps, generators, carts, loaders, hand tools, and miscellaneous equipment and supplies.

the sale at auction of certain of the Debtor's assets. Liens, claims and encumbrances were to attach to the same extent and with the same validity to the proceeds of the sale, subject to later determination by this Court, save and except any charges incurred in connection with the sale.

Prior to the auction, each of the bidders at the auction had submitted written offers to purchase all of Flores' remaining assets. These bids ranged from $350,000 to $580,000.

The auction was held October 5, 1989. At auction, all of Flores' assets, including the greenhouses, rose bushes, equipment, and supplies were sold as a package for $900,000. The closing of the sale was contingent upon the ability of the successful bidder to obtain a new lease of the premises from New Mexico State University. The successful bidder, Aldershot of New Mexico, Inc. ("Aldershot") obtained that lease and the sale was consummated.

On December 13, 1991, Flores, in its capacity as debtor in possession, filed its Second Amended Complaint Objecting To Secured Claim And Seeking Valuation. In that complaint, Flores asserted that Banda Negra had no validly perfected security interest in Flores' accounts receivable as Flores had not executed a security agreement relating to accounts receivable or their proceeds. Flores further alleged that Banda Negra had no validly perfected security interest in the rose bushes and the prefabricated office building because the financing statements filed by Banda Negra failed to adequately describe these assets. Flores also alleged that Banda Negra had no interest in the computer system owned by Flores because Flores had previously granted a security interest in the computer system to Circle Business Credit as security for the purchase of the computer. Finally, Flores alleged the value of the assets sold at auction was substantially less than the price obtained.

## DISCUSSION

This case presents the Court with the competing claims of Banda Negra, a secured creditor of the Debtor, and the bankruptcy estate which, under the Bankruptcy Code, has "the rights and powers of ... a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains ... a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien...." 11 U.S.C. § 544(a). The bankruptcy estate thus becomes a "perfect lien creditor," and as such, may have priority in the proceeds of the sale of the disputed assets. The resolution of the competing claims of the bankruptcy estate and Banda Negra involve several issues; the value of the assets sold at auction; interpretation of a poorly drafted security agreement and financing statement relating to the rose bushes, the computer system, and the prefabricated office building; and whether Banda Negra's filing of a financing statement relating to accounts receivable without a security agreement was sufficient to perfect a security interest in the accounts receivable.

### Value Of The Assets Sold At Auction

Banda Negra holds a secured claim only to the extent its claim is secured by the collateral in which it holds a security interest. Section 506(a) of the Bankruptcy Code states:

"An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property ... and is an unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim."

Flores granted Banda Negra a security interest in its assets to secure payment of a note in the amount of $1,100,000. Flores' assets sold at auction for $900,000. Thus, if the amount paid for Flores' assets is their true value and Banda Negra possesses a perfected security interest in all assets sold, Banda Negra has a secured claim in the amount of $900,000 and an unsecured claim in the amount of $200,000. If, however, as asserted by Flores, the value of the assets sold is substantially less than $900,000, or Banda Negra does not possess

a perfected security interest in all assets sold, Banda Negra's secured claim will be reduced and its unsecured claim increased, thus benefiting the bankruptcy estate.

■ The price paid at a commercially reasonable sale is the best evidence of value, and the Court is not required to consider other possible methods of valuation. *In Re Two "S" Corporation*, 875 F.2d 240 (9th Cir.1989). No allegation has been made that the format of the auction conducted by the U.S. Trustee was not commercially reasonable. In *In Re Two "S" Corporation*, the court stated:

> We have found no cases holding that after a single asset is sold at a commercially reasonable sale, the Court is still required to consider other possible methods of valuation. Rather, the cases state that the price paid at a commercially reasonable sale is the best evidence of value. (citations omitted).

*Two "S"*, 875 F.2d at 243. Determination, however, that the proceeds of a sale constitute the best evidence of value is not tantamount to a determination that the proceeds of a commercially reasonable sale conclusively and irrebuttably constitute a determination of value. *In re Durrett*, 23 C.B.C. 95 (5th Cir.1980). Thus, while not specifically required to do so, this Court is free to consider other factors which may influence the value of the assets sold.

■ The Plaintiff lists eight factors that it asserts the Court should examine, in addition to the price obtained at auction, in determining the value of the assets sold. These factors are:

1. The Debtor's opinion as to the value of the properties;

2. The condition of the properties immediately prior to the auction;

3. Substantially divergent bids for the properties immediately prior to the auction;

4. Substantially divergent bids at auction;

5. The fact that the properties auctioned were auctioned subject to the successful bidder being able to effectuate a successful long term lease of the premises where the properties were located;

6. The bizarre withdrawal of the second highest bid;

7. The testimony of the successful bidder to the effect that the properties were worth substantially less than the amount bid; and

8. The competing interests of the creditors in this proceeding with respect to the values which will ultimately be attributed to those properties.

Each of these factors shall be addressed in turn. As to the first factor, the Debtor's opinion as to the value of the properties, there is no evidence on the record as to how the Debtor has any greater expertise in valuing these assets than did the successful bidder at auction.

The second factor, the condition of the properties, is reflected in the price paid at auction. The record shows that all of the bidders at the auction were professionals with substantial expertise in the greenhouse industry and were familiar with the assets sold and the condition of those assets.

The third and fourth factors, the wide range of offers for the assets, before and during the auction is also unconvincing. The record shows that the various offers for Flores' assets started at a very low figure and continued to escalate during the bidding process, both before and during the auction. This appears to be the usual pattern of bidding and this Court sees no reason that the determination of value should be influenced by it. The fact that the early offerors thought they might "steal" these assets from the estate has no bearing on the price ultimately obtained for the assets.

The fifth factor, that Flores' assets were auctioned subject to the successful bidder being able to obtain a new lease, is the most convincing of the factors listed by Plaintiff. In the end, however, it is also unpersuasive. All bids at the auction were made subject to obtaining a new lease from New Mexico State University for the real estate that Flores had leased from the Uni-

versity. That lease was eventually obtained by Aldershot, the successful bidder.

Had the risk of obtaining the new lease been on the successful bidder, this Court would agree that the amount bid for Flores' assets may have been in need of adjustment. In that situation, however, the value of the assets auctioned would have had to be increased as the risk carried by the successful bidder would have decreased the value of the assets to him. That was not the situation here. The Plaintiff is arguing for a decrease in the value of the assets sold based upon the need for a new lease. But the closing of the auction sale was specifically conditioned on the high bidder obtaining such a lease. Thus, the Court finds this factor to be unpersuasive.

The sixth factor, the withdrawal of the second highest bid, which the Plaintiff characterizes as "bizarre", was in fact anything but. The second highest bid was withdrawn solely because, had it not been withdrawn, that bidder would have been obligated to purchase Flores' assets had the successful bidder failed to perform. The record shows that the second highest bidder was under pressure to either purchase Flores' assets or to add additional space to another greenhouse operation and was unable to wait for any additional period of time to find out whether Aldershot would perform. The record shows that the second highest bidder placed an order for additional greenhouses the day following the auction. Thus, this Court finds this factor to be unpersuasive.

The seventh factor, the successful bidder's testimony that the assets purchased were worth substantially less than the amount bid is likewise unconvincing. Plaintiff cites a number of sections from a deposition of Mr. Peter Vanderlugt, President of Aldershot, in support of this proposition. Each of the sections cited is, however, either unrelated to the value of the assets on the date of the auction or related to the value of the assets if it was necessary to move them to another site. Nowhere does Mr. Vanderlugt state that the price bid for Flores' assets was greater than the value of the assets if a new lease from New Mexico State University could be obtained. As previously discussed, the sale was contingent on that lease being obtained and, thus, the value of the assets to Aldershot would appear to be the price paid.

As to the final factor listed by the Plaintiff, this Court is unconvinced that the competing interests of the creditors in this case has anything to do with the objective value of Flores' assets. This Court does not find, in this case, that any of the factors argued outweigh the price paid at a commercially reasonable sale in determining the value of the assets sold.

Further, other objective criteria suggest that Flores' assets were worth at least $900,000, the price paid at auction. Testimony by Samuel Goldman, Flores' Chief Executive Officer, indicated that Flores' initial investment in the greenhouses and associated equipment was approximately 3.5 million dollars. Testimony of various bidders indicated a replacement cost of between three and six million dollars. It appears to this Court that a selling price of between one-third and one-sixth of the replacement cost for these assets is reasonable.

### Interpretation of the Financing Statement and Security Agreement

Banda Negra asserts that it possesses a perfected security interest in the proceeds of all assets sold at the auction including a large number of rose bushes used for the production of cut roses, a prefabricated office building, and a computer system. These three items are not specifically enumerated in the financing statements filed by Banda Negra that lists those items in which Banda Negra holds a security interest. Banda Negra, however, asserts that these three items constitute "miscellaneous equipment" listed in paragraph six of its financing statement and it therefore holds a perfected security interest in these assets.

The creation and perfection of security interests in personal property and fixtures

is covered by Article 9 of New Mexico's version of the Uniform Commercial Code (U.C.C.). N.M.S.A. § 55–9–102(1)(a) provides that the "this Article applies to any transaction ... which is intended to create a security interest in personal property or fixtures...." There is no dispute that each of the items in question is either personal property or a fixture, thus, the U.C.C. governs in this transaction.

■ In their security agreement, Banda Negra and the Debtor agreed that the New York version of the U.C.C. would govern the rights of the parties to that agreement. Defendant, Banda Negra asserts that New York law must therefore govern this dispute. This Court disagrees. Had Flores not filed for Chapter 11 bankruptcy protection, or had the dispute been between the Debtor and Banda Negra, New York law would apply. After filing for Chapter 11 protection, however, Flores became the debtor in possession with the rights, duties, and powers of a trustee in bankruptcy. 11 U.S.C. § 1107(a). Thus, the issues in dispute do not involve the interpretation of the agreement entered into between Flores, as borrower, and Banda Negra, as a secured creditor. Rather the issue is whether the debtor in possession, with the powers of a trustee in bankruptcy, or Banda Negra have a superior claim to the proceeds of the sale of the disputed assets. The rights of a perfect lien creditor should be determined in accordance with the laws of New Mexico.

If Banda Negra has a perfected security interest in the disputed items, its claim to the proceeds from the sale of those items will be superior to the claim of the bankruptcy estate to the same proceeds. N.M.S.A. § 55–9–301(4). If, however, Banda Negra does not possess a perfected security interest in the disputed items, the claim of the bankruptcy estate, with the powers of a judgment lien creditor, will be superior to Banda Negra's claim to the proceeds. N.M.S.A. § 55–9–301(1)(b).

While a security interest may be perfected in various ways under the U.C.C., only one method of perfection is applicable to the disputed transaction, perfection by filing a financing statement under N.M.S.A. § 55–9–302. The proper place for filing varies depending upon the type of collateral upon which a security interest is being perfected. If the secured party is attempting to perfect a security interest in equipment, the proper place for filing is with the Secretary of State. N.M.S.A. § 55–9–401(1)(c). If the collateral is equipment used in farming operations, the filing must be with the office of the county clerk in the county of the debtor's residence. N.M.S.A. § 55–9–401(1)(a). If the collateral is a fixture, or will become a fixture, then the proper place for filing is in the real property records in the office where a mortgage on the real estate would be filed or recorded. N.M.S.A. § 55–9–401(1)(b). Banda Negra attempted to perfect its security interest in the disputed items by filing a financing statement with the office of the County Clerk of Dona Ana County and with the office of the Secretary of State.

■ A financing statement must contain certain information including the names of the debtor and the secured party, the address of the secured party, the mailing address of the debtor, and a statement indicating the types, or describing the items of collateral. N.M.S.A. § 55–9–402(1). A statement indicating the types of collateral is generally sufficient. The financing statement may also describe the items of collateral if the description is sufficient to reasonably identify what is described. N.M.S.A. § 55–9–110. Banda Negra asserts that the phrase "miscellaneous equipment" contained in paragraph six of the financing statement is a sufficient description covering all of the disputed items. The debtor in possession asserts that the description is insufficient. No other dispute exists as to the form or content of the financing statements.

■ The U.C.C. divides personal property into various categories, one of which is "goods." "Goods" are defined to include "all things which are movable at the time the security interest attaches or which are fixtures...." A fixture is defined as "goods ... so related to particular real estate that an interest in them arises under

real estate law." N.M.S.A. § 55–9–313(1)(a). Thus, the three items in question, the rose bushes, the office building, and the computer system were all goods under the U.C.C. definition at the time Banda Negra's security interest was created.

Goods are further divided into four subcategories, consumer goods, equipment, farm products, and inventory. N.M.S.A. § 55–9–109. Goods are

(1) "consumer goods" if they are used or bought for use primarily for personal, family or household purposes;

(2) "equipment" if they are used or bought for use primarily in business (including farming or a profession) ... or if the goods are not included in the definitions of inventory, farm products or consumer goods;

(3) "farm products" if they are crops or livestock or supplies used or produced in farming operations or if they are products of crops or livestock in their unmanufactured states ..., and if they are in the possession of a debtor engaged in raising, fattening, grazing or other farming operations. If goods are farm products they are neither equipment nor inventory;

(4) "inventory" if they are held by a person who holds them for sale or lease ..., or if they are raw materials, work in process or materials used or consumed in a business. Inventory of a person is not to be classified as his equipment.

N.M.S.A. § 55–9–109. To ascertain whether Banda Negra has a perfected security interest in each of the items, a three part analysis is required. First, it is necessary to determine into what category each item fits. Second, it is necessary to determine whether each item had become so related to the real estate that an interest arose under real estate law making the item a fixture and thus requiring a fixture filing under N.M.S.A. § 55–9–402 to create a perfected security interest. Finally, it is necessary to determine whether the financing statement sufficiently describes each item so as to put a potential lender on notice that Banda Negra held a perfected security interest in that item. Each item will be addressed in turn. Only if a perfected security interest is found not to exist will it be necessary to reach the issue of valuation. If a perfected security does not exist as to those items, the value of Banda Negra's perfected security interest will decrease by their value.

### The Rose Bushes

The definitions in N.M.S.A. § 55–9–109 are mutually exclusive. A chattel cannot fall into more than one of the four categories at the same time. Official Comment to N.M.S.A. § 55–9–109. The rose bushes are not consumer goods as they were not bought for use "primarily for personal, family or household purposes." N.M.S.A. § 55–9–109(1). They are not inventory as the bushes themselves were not held for sale. N.M.S.A. § 55–9–109(4). Rather the bushes were used to produce successive crops of cut roses. Thus, the rose bushes must be either farm products or equipment.

The roses are farm products if they are crops or supplies used or produced in farming operations or if they are products of crops in their unmanufactured states, and if they are in the possession of a debtor engaged in raising or other farm operations. N.M.S.A. § 55–9–109(3). As the debtor was engaged in the business of raising roses and container grown plants, the debtor was engaged in raising or other farm operations. The rose bushes are not products of crops, as the debtor was in the business of selling cut roses, not growing rose bushes. The cut roses were the product of the bushes. The question remaining is whether the rose bushes are a crop.

Under pre-U.C.C. law, annual harvesting was required to make a plant a "crop." *Kennedy v. Spalding*, 143 Kan. 76, 53 P.2d 804 (1936). In that case, nursery stock of fruit trees, ornamental trees, shrubs and bushes planted by a tenant were held not to constitute a crop for the purposes of determining whether a landlord had a lien on nursery stock planted by the tenant. *Id.*

In *Mountain Credit v. Michiana Lumber & Supply, Inc.*, 31 Colo.App. 112, 498

P.2d 967 (1972), the question was whether log loaders used in a logging operation by a logging company constituted equipment used in a farming operation. The court held that logging did not constitute a farming operation, and defined farming:

> Farming in the traditional sense, however, pertains to preparation of soil, planting of seeds, caring for crops, and harvesting the yield at the end of the process. One can be a farmer of trees if they are grown from seed and cared for in a nursery setting, but the commercial logging of trees by a firm such as Loggers, Inc. is not farming. It is an industrial operation.

*Id.* at 969.

In *Lewis v. Lewis Nursery, Inc.*, 80 N.C.App. 246, 342 S.E.2d 45 (1986), a tenant was in the business of raising strawberry plants for resale to nurseries. The type of strawberry involved was raised annually and gathered during a single season. *Id.* The court found that the strawberry plants were personalty in the nature of crops. *Id.* at 50.

The distinction is whether the tenant plants seeds (or very young plants), raises them, and harvests the entire plant, in which case they constitute crops, or whether the fruit of the plant is harvested. In the latter case, the plant is not a crop, and therefore must constitute equipment under N.M.S.A. § 55–9–109(2), as any item which does not fit into the other categories is defined as equipment. Here, the rose bushes were not harvested basis. Rather the bushes produced successive crops of blooms, which were periodically harvested. The rose bushes had a life expectancy of seven to eight years and testimony at trial showed that there was no intent to remove the bushes until the they ceased producing adequate crops of cut roses. Thus, the rose bushes must be equipment under N.M.S.A. § 55–9–109.

If, however, the rose bushes had become so related to the real estate that an interest in them arose under real estate law, they are fixtures within the meaning of N.M.S.A. § 55–9–313. The Defendant asserts that as a matter of law the rose bushes are personalty because the lease agreement between Flores and the University, the owner of the real estate, provides that the "corporation personalty" will remain the property of Flores and may be removed by Flores at the end of the lease period.

The lease defines "corporation personalty" as "all personal property located on, or owned or used by Corporation in connection with the Land or the Project, or any building or improvements built on the Land or the Premises, including the personal property which is listed on Exhibit F." Defendant's Exhibit 26, p. 2. The rose bushes are not listed in Exhibit F.[2] The lease, however, provides that "corporation improvements" will remain the property of the lessor at the end of the lease period. "Corporation improvements" are defined as "the buildings, improvements, fixtures (excepting trade fixtures), Delivery Systems and water meters which are owned by Corporation and built or placed by Corporation

---

2. Exhibit F states:

December 31, 1986
CORPORATION PERSONALTY

1. *Phase I Greenhouses:* 10 greenhouse structures consisting of Packer Plada, Ltd., prefabricated, galvanized steel structures 413 ft. × 105 ft. × 13 ft. on concrete column foundations, including 21 gallon exhaust fans (48″), cooling pads 413 ft. × 5 ft. × 4″, 9–1–NEPCO NB–400 gas fired unit heaters, 6 polyethylene covers with double layer roofs and corrugated fiberglass covers and shade cloths, and Metafim dripper/sprinkler irrigation systems.
2. *Phase II Greenhouses:* Same description as above except all buildings will have polyethylene covers.

3. *Warehouse:* Pascoe pre-engineered metal building 70 ft. × 120 ft. 21 ft. attached to concrete pad.
4. Refrigeration coolers manufactured by Bally covering total floor space of 60 ft. × 19 ft. × 9 ft. height.
5. *Tractors:*
 a. L4150 Kubota 50 h.p. 4–wheel drive
 b. B6200 Kubota 15 h.p. 4–wheel drive
 c. Bobcat 16.5 h.p.
 d. Howard Rotovator with bed shaper
6. Javco super-potting machine with accessories.
7. Javco soil mixer.
8. Various conveyor belts, motors, tanks, pumps, generators, carts, loaders, and hand tools.

on the Land or used by Corporation in connection with the Land or Project."

Defendant's argument thus begs the question; if the rose bushes are fixtures (excepting trade fixtures) they are corporation improvements and not removable. If the rose bushes remain personalty, they are removable under the terms of the lease. The determination of whether an item has become a fixture or trade fixture is made under state law.

■ New Mexico, while recognizing the existence of trade fixtures, has never specifically defined them. See, *Boone v. Smith,* 79 N.M. 614, 447 P.2d 23 (1968). Thus it is necessary to look to other jurisdictions for a definition. In *J.K.S.P. Restaurant v. County of Nassau,* 127 A.D.2d 121, 513 N.Y.S.2d 716, 720 (2nd Dept.1987), the court defined trade fixtures as "articles of personal property which a tenant places upon or annexes to the leased realty for the purpose of carrying on its trade or business during the term of its lease." (citations omitted). The court went on to state that trade fixtures remain the property of the tenant even with "respect to structures as substantial as entire buildings, which have been held to constitute trade fixtures and, thus, are removable by the tenant." (citations omitted). *Id.*

In *Lewis v. Lewis Nursery, Inc.,* 80 N.C.App. 246, 342 S.E.2d 45 (1986) the court stated "trade fixtures generally are items designed to adapt the premises to the tenant's business. 35 Am.Jur.2d *Fixtures* Sec. 40 (1967). They are for example, machinery; mining, agricultural, industrial, or other specialized equipment; particular buildings; heating, cooling, electrical plumbing and refrigeration systems; storage facilities; and some specialized appliances." *Id.* at 50.

Each of these definitions includes items of personal property necessary to adapt a particular building or site to the needs of the tenants business. This Court has found no case that defines trade fixtures to include live plants. The nursery cases cited by the Defendant are not applicable to this issue. Those cases hold that nursery stock, planted by a tenant and intended for eventual sale are personalty. None of those cases hold that nursery stock is a trade fixture. See, *Duffus v. Bangs,* 122 N.Y. 423, 25 N.E. 980 (N.Y.Ct.App., 2nd Div.1890); *Story v. Christin,* 14 Cal.2d 592, 95 P.2d 925 (Cal.1939); *Lewis v. Lewis Nursery, Inc.,* 80 N.C.App. 246, 342 S.E.2d 45 (1986); *Kennedy v. Spalding,* 143 Kan. 76, 53 P.2d 804 (1936).

In the instant case, the evidence shows that the rose bushes were not intended for eventual sale. Testimony at trial showed that it was the intent of Flores to continue to produce cut roses for the useful life of the rose bushes. Testimony further showed that the useful productive life of the rose bushes was between seven and eight years.

Further, language contained in the lease between the University and Flores is determinative only of the rights and responsibilities between Flores and the University. In this case, the dispute is between Flores, as the debtor in possession, and Banda Negra, as the holder of a security interest. At most, the lease is evidence of Flores' intent with regard to the rose bushes. Nor has the Defendant convinced this Court that the intent of the parties that a particular item remain personal property even though it would objectively be viewed as a fixture is determinative. The requirement of filing a financing statement is designed to give a potential lender notice of an already existing security interest. Official comment to N.M.S.A. § 55–9–402. If a security interest is obtained in what must objectively be viewed as fixtures, a fixture filing is required, even though, as between the parties, it is agreed that the collateral remain personal property. Thus, this Court must conclude that the rose bushes were not trade fixtures.

■ In New Mexico, intent, adaptation, and annexation are the three relevant factors in determining whether personal property has become so attached to real estate that an interest in that property arises under real estate law. *Kerman v. Swafford,* 101 N.M. 241, 680 P.2d 622 (1984). Adaptation and annexation are principally relevant as indicators of intent,

which is the controlling consideration and the chief fixture test. *Id.* at 243. Courts have historically been concerned with apparent or objective intent, rather than the actual state of mind of the owner or installer of the purported fixture. *Southwestern Public Service Co. v. Chaves County,* 85 N.M. 313, 512 P.2d 73 (1973). Where a court finds objectively manifested intent, a fixture may be presumed or inferred from the circumstances. *Kerman* 680 P.2d at 625.

 No New Mexico court has addressed the question of whether growing plants, planted directly in the earth, become fixtures and I have found only one case from another jurisdiction, *First Wisconsin National Bank of Milwaukee v. Federal Land Bank of St. Paul,* 849 F.2d 284 (7th Cir.1988), which addresses this question. In that case, the court held that cranberries plants, planted in a cranberry bog, had become so related to the real estate that an interest in them arose under real estate law and that they were thus fixtures. *Id.* at 287. The court based its holding on the same three part test used in New Mexico, finding that the roots of the cranberries were embedded in the soil thus affixing the vines to the reality. The planting of the vines in the bog constituted a "use or purpose to which the realty is devoted" which met the test for adaptation. And finally, that "it is the presumed intention of a hypothetical ordinary reasonable person that when a cranberry vine is planted in a cranberry bog such vine will remain a permanent accession to the real estate." *Id.* at 287.

In the instant case, no showing has been made that Flores had the subjective intent that the rose bushes remain personal property. Defendant asserts that the lease with the University demonstrates that intent. As previously discussed, however, this Court has found the lease to be ambiguous in its treatment of the rose bushes.

The evidence shows that the rose bushes were planted directly into the earth, and that each bush has a root system that extends three or four feet into the earth. Thus, the bushes were affixed to the realty. The evidence further shows that Flores intended to produce successive crops of cut roses from these bushes for a period of seven to eight years, at which time the bushes would be in need of replacement and that Flores had gone to substantial expense to erect a series of greenhouses specifically designed for the production of cut roses. Thus, the requirement of adaptation of the realty is met. Finally, the evidence shows that Flores had no intent to sell or dispose of the rose bushes and that Flores planned to be a long term producer of cut roses. This Court therefore finds that the rose bushes had become so attached to the real estate that an interest in them arose under real estate law, and that they became fixtures.

Even if the rose bushes were not found to be fixtures, this Court finds that based upon these facts, the description "miscellaneous equipment" contained in paragraph six of the financing statement and Exhibit F of the security agreement which lists the collateral is insufficient to give notice to potential lenders that Banda Negra claimed a perfected security interest in the rose bushes.

 The financing statement must indicate the type, or describe the items of collateral. N.M.S.A. § 55–9–402(1). The financing statement is primarily designed to put potentially interested third parties on notice that a security interest is claimed in particular property owned by the debtor. Interested third parties may obtain additional information as to the extent of the secured party's security interest by making inquiry under other provisions of Article 9. William Hawkland, *Hawkland U.C.C. Series,* § 9–110:02 at 465 (1990). Thus, the purpose of notice filing under Article 9 of the U.C.C. is to put others on notice of a secured party's claim. *First National Bank of Franklin Co. Tenn. v. Smith,* 447 So.2d 705 (Ala.1984). The question of adequacy of description is a question of law, and not of fact. *State v. Woodward,* 100 N.M. 708, 675 P.2d 1007, 1011 (1983). "The test for the adequacy of a description is whether it does the job it was designed to

do." *Valley Federal Sav. Bank v. Stahl,* 110 N.M. 169, 793 P.2d 851, 854 (1990).

 A description contained within a financing statement is thus sufficient if it puts a potential lender on notice to inquire whether a security interest exists. The phrase "miscellaneous equipment" contained in paragraph six of the financing statement, following a detailed listing of other items of collateral is not sufficient to put third parties on inquiry notice that Banda Negra claimed a security interest in one of Flores' major assets, approximately 60,000 rose bushes.

As the financing statement need only indicate the type of goods in which the secured party claims an interest, the terms "inventory," "equipment," "supplies" or "consumer goods" will generally be sufficient. See, *In Re Burnett,* 21 B.R. 752, 754 (D.N.M.1982), citing *Jones and Laughlin Supply v. Dugan Production Corp.,* 85 N.M. 51, 508 P.2d 1348 (1973). Here, however, the secured party chose to list all major assets of Flores with complete and exact descriptions. Only in the final catch all paragraph did the phrase "miscellaneous equipment" appear. This ambiguous description is insufficient to place a potential lender on notice that a security interest was claimed in the rose bushes.

Even if a potential lender was put on notice by this ambiguous phrase, the lender would receive no additional information through examination of the security agreement, as that document contains the same description as the financing statement. The security agreement must provide a description of the collateral. N.M.S.A. § 55–9–203(1)(a). Because the security agreement identifies the items of collateral, greater particularity is required than in the financing statement. *State v. Woodward,* 100 N.M. 708, 675 P.2d 1007, 1010 (1983). In contrast, N.M.S.A. § 55–9–402(1) provides that either a description or indication of the types of collateral be contained in the financing statement. A description is sufficient if it reasonably identifies what is described. N.M.S.A. § 55–9–110. The official comment to that N.M.S.A. § 55–9–110 states "[t]he test of sufficiency of a de-

scription laid down by this section is that the description do the job assigned to it—that it make possible the identification of the thing described."

 Thus, even if this Court were to hold the phrase "miscellaneous equipment" to be a sufficient indication of the type of collateral in the financing statement, the same phrase would not be sufficient in the security agreement as it fails to reasonably identify what is described. This Court therefore holds that Banda Negra failed to perfect its security interest in the rose bushes for three independent reasons. The rose bushes are fixtures under N.M.S.A. § 55–9–313 and thus, a fixture filing under N.M.S.A. § 55–9–401 was required to perfect a security interest in them. Such a filing was not made by Banda Negra. Even if found to be equipment, the phrase "miscellaneous equipment" contained in the financing statement was insufficient to place potential lenders on notice of the security interest claimed by Banda Negra. Thus, Banda Negra failed to perfect its interest in the rose bushes. Finally, even if the description in the financing statement were found sufficient, the same description contained in the security agreement was not sufficient to evidence a security interest in the rose bushes.

As this Court has found that Banda Negra does not possess a perfected security interest in the rose bushes, it is necessary to address the issue of valuation. The evidence before the Court going to this issue is both contradictory and slight, both to the aggregate value of the rose bushes and their number.

Mr. Samuel Goldman testified at trial that Flores originally planted 60,000 rose bushes and had lost approximately seven thousand prior to the auction. Mr. Peter Vanderlugt, the Chief Executive Officer of Aldershot, testified in his deposition that Aldershot purchased about 34,000 rose bushes at the auction, a difference of 19,000 rose bushes. Vanderlugt's Deposition, Plaintiff's Ex. 6 at p. 40.

Evidence about the aggregate value of the rose bushes is equally contradictory. Vanderlugt testified that several months

after purchasing the greenhouse operation, a decision was made to remove the rose bushes because a change in the market for cut roses made rose production unprofitable. The best offer he received for the bushes was from another rose producer who was willing to remove the bushes at no charge. He accepted that offer. No testimony was offered about the cost of removing the bushes.

Prior to the auction, however, in an earlier offer to purchase the assets, Vanderlugt allocated $100,000 to the rose bushes without indicating the number of bushes he believed existed. Alexander Mason, another perspective purchaser, allocated a value of $30,000 to the rose bushes based on the assumption that a total of 60,000 rose bushes existed. Defendant's Ex. 31. While Vanderlugt certainly received some value for the free removal of the bushes, it is not possible for this Court to determine the value received based upon the record.

The evidence shows that Aldershot harvested over 100,000 roses from the bushes for Valentine's Day 1990 and that the decision to remove the bushes was based upon Aldershot's high cost for the production of cut roses and changes in the market for cut roses after it purchased Flores. It appears that the value of the rose bushes to Aldershot changed after its purchase of Flores' assets due to its cost of operation and fluctuations in market price. Thus, the amount received by Flores when it sold the bushes does not fairly represent the value of the rose bushes on the date of the auction.

Based upon this sketchy evidence, this Court finds the value of the rose bushes on the date of the auction to be $100,000. The best evidence of the value of the bushes is the amount allocated to them by Aldershot in its September 6, 1989 bid. That bid was made within one month of the auction, by the successful bidder at the auction.

### The Prefabricated Office Building

■ If the office building is not a fixture, it must be equipment under N.M.S.A. § 55–9–109. It cannot be inventory, as it was not held for sale; it cannot be consumer goods, as it was not used "primarily for personal family or household purposes;" and it obviously is not a farm product. N.M.S.A. § 55–9–109. The question then is whether the prefabricated office building had become so related to the real estate that an interest in it arose under real estate law. N.M.S.A. § 55–9–313(1)(a).

The litigants have been particularly unhelpful with regard to the office building. No testimony exists as to the method of construction, method of attachment, if any, to the realty, whether gas and water lines were attached to the building, or to the exact size of the structure. The only testimony before this Court relating to the office building is that of Alexander Masson, one of the prospective purchasers of Flores' assets. When asked whether he was aware that this was a prefabricated building, Mr. Masson stated, "[a]s I recall, it was a double-wide trailer. But it may have been. I don't know. I don't remember now. Prefab. It could be removed, and I figured I could get $20,000 for it." Deposition of Alexander Masson, Defendant's Ex. 27 at p. 26.

From this singularly sparse evidence, this Court must now determine whether this structure had become so attached to the real estate that an interest arose in it under real estate law. In *Kerman v. Swafford*, 101 N.M. 241, 680 P.2d 622 (1984), the court held that prefabricated ranch buildings bolted to concrete slabs and which were necessary to the operation of the ranch were fixtures. *Id.* at 625. The court stated:

> The nature of the property, the manner of its construction, and its intended use all go to show that it was the intention of the party who made the improvements that they should be permanent additions to the land.... Under such circumstances the articles, so attached, are presumed to have become a part of the realty.

*Id.* quoting, *Patterson v. Chaney*, 24 N.M. 156, 173 P. 859, 860 (1918). The court further stated that a substantial building is real estate absent some controlling contractual relationship. *Id.* citing *Southwestern Public Service Co. v. Chaves County*, 85

N.M. 313, 512 P.2d 73, 77 (1973). Absolute permanence, however, is not required. *Southwestern* at 77.

Plaintiff bears the burden of proof. The only evidence before this Court is that the structure was a prefabricated building about the size of a double wide mobile home. This Court finds a prefabricated structure of that size to be less than substantial. Thus, the presumption that a substantial building is a part of the realty does not arise. This is particularly true when a prospective purchaser planned on removing the structure. This Court further finds that plaintiff has failed to present any evidence to show that the structure had become affixed to the realty. The office building is thus equipment under N.M.S.A. § 55-9-109.

This Court further finds that the description "miscellaneous equipment" in the financing statement filed by Banda Negra is sufficient to place an interested third party on inquiry notice that Banda Negra claimed a perfected security interest in the office building. Unlike the rose bushes, a single prefabricated portable office building, which is not a substantial asset, and which could readily be removed, is the type of item which might reasonably be grouped in a catch-all paragraph and labeled "miscellaneous equipment." For the same reason, this Court finds that the same phrase contained in the security agreement between Flores and Banda Negra is a sufficient description.

### The Computer System

There can be no doubt that a computer system, used by a business engaged in the production of container grown plants and cut flowers is equipment under the U.C.C., barring exceptional circumstances. No showing of any exceptional circumstances has been made, and, thus, this Court finds the computer system to be equipment. N.M.S.A. § 55-9-109(2).

This Court further finds that the phrase "miscellaneous equipment" contained within the financing statement and security agreement is sufficient to create a perfected security interest in the computer system. Such an asset is of the type which could reasonably be included in a catch-all paragraph and labeled "miscellaneous equipment."

Plaintiff asserts in Count VII of its Second Amended Complaint that another entity, Circle Business Credit, has a perfected security interest in the computer system, and that because of this perfected security interest, Banda Negra's security interest remains unperfected. Plaintiff, however, has presented no evidence to support this allegation, and, thus, it will not be addressed here.

### The Accounts Receivable

Banda Negra properly filed a financing statement relating to Flores' accounts receivable. It is undisputed that no security agreement was signed by the Debtor that related to the accounts receivable. Banda Negra asserts two theories under which it claims a perfected security interest in the accounts receivable. First, the financing statement alone is sufficient to serve as both the financing statement and security agreement. Second, that if the financing statement alone is insufficient, extrinsic documents, specifically a Loan Agreement dated July 13, 1988, and a Memorandum of Understanding dated February 18, 1988, neither of which is entitled "security agreement," together with the financing statement, provide all the requisites of a security agreement.

Banda Negra asserts that analysis of this issue should be governed by the law of Delaware, as the loan agreement entered into between Flores and Mr. Frank Shannon dated July 13, 1988, so provides. Defendant's Ex. 5, § 8.5. That agreement, however, was not made with Banda Negra, but, rather, with an individual who has some relation to Banda Negra. Thus, this Court will not regard a choice of law provision in that document as binding on this issue. Further, Banda Negra has stated that Delaware has not addressed this question. Therefore, even if this Court were to find Delaware law to be controlling, this Court would have no guidance in deciding this question.

No New Mexico case has directly addressed this issue. In *In Re Bud Long Chevrolet, Inc.*, 39 B.R. 499 (Bankr.D.N.M. 1984), interpreting *Jones and Laughlin Supply v. Dugan Production Corp.*, 85 N.M. 51, 508 P.2d 1348 (1973), this Court has, however, held that where there is a conflict between the financing statement and the security agreement, the security agreement prevailed and to the extent the financing statement exceeded the scope of the security agreement, it had no effect. In that same case, this Court declined to look beyond the security agreement to external evidence contained in a loan agreement entered into between the parties in an attempt to extend the scope of the security agreement. *Bud Long*, 39 B.R. at 503.

We will first address whether the financing statement, standing alone, is sufficient to create a perfected security interest in Banda Negra. "Security agreement" is defined as "an agreement which creates or provides for a security interest ..." N.M.S.A. § 55–9–105(1)(h). "Agreement" is defined as "the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance as provided in this act ..." N.M.S.A. § 55–1–102(3). The formal requisites for a security agreement only require that the security agreement contain a description of the collateral and that it be signed by the debtor. N.M.S.A. § 55–9–203(1)(a).

■ This Court declines to find that a properly filed financing statement can, in this instance, serve both as a financing statement and security agreement even though it is signed by both parties to the transaction. A security agreement is a document which "provides for or creates a security interest." N.M.S.A. § 55–9–105(1)(h). The standard form U.C.C.–1 used in this case neither specifically "provides for" or "creates" a security interest. Rather, it simply provides notice to potential lenders of Banda Negra's claim to a security interest in Flores' accounts receivable. Without New Mexico precedent, this Court is unwilling to broaden the law to find that a properly filed U.C.C.–1 may serve as both a financing statement and security agreement.

This Court also, in accord with its ruling in *In Re Bud Long Chevrolet, Inc.*, 39 B.R. 499 (Bankr.N.M.1984), declines to find that it may look to extrinsic documents in an attempt to find a security agreement where no specific document purporting to be a security agreement exists. In that case, this Court stated, "that even though a financing statement would put third parties on notice to inquire into a creditor's security interest, that will not serve to benefit the creditor if the security interest does not cover the disputed items." *Bud Long* at 503, citing *Jones & Laughlin Supply v. Dugan Production Corp.*, 85 N.M. 51, 508 P.2d 1348 (1973). Obviously, if no security agreement exists, it does not cover the disputed items.

Further, even if this Court were willing to look to extrinsic evidence to find a security agreement, the available evidence is particularly scant. First, the loan agreement of July 13, 1988 was not entered into by Banda Negra. Rather, it was entered into by Mr. Frank Shannon, as an individual. Banda Negra has provided no authority for the proposition that this Court may look to documents executed by third parties for evidence of a security agreement.

Even if this Court does look to the loan agreement, its only reference to the accounts receivable is contained in § 3.12 which states:

All of the accounts receivable of the Borrower reflected on the Form 10–Q for the period ended February 28, 1988 or existing on the Closing Date are valid and enforceable claims of the Borrower, are fully collectable and, except as to such liens created pursuant to a Loan Agreement and Secured Convertible Promissory Note in the principal amount of $1,100,000 each dated March 8, 1988 between the Borrower and Banda Negra International, Inc. as lender, and such liens created as a result of the Settlement Agreement are not subject to any further liens, right of setoff or counterclaim.

Defendant's Ex. 5, § 3.12. In effect, this section states that all accounts receivable are collectable and have no liens against them, except those that resulted from the March 8, 1988, loan agreement.

The March 8, 1988, loan agreement states that the loan will be secured by the assets listed in Exhibit A attached to the March 7, 1988 security agreement. Exhibit A to that agreement is shown in footnote 1, supra. Accounts receivable, however, are not listed in that exhibit. Thus, the reference to liens on accounts receivable in the July 13, 1988, loan agreement does not appear particularly helpful to Banda Negra as no liens on accounts receivable were created by the March 8, 1988, loan agreement. Banda Negra's argument apparently is that the July 13, 1988 loan agreement shows Banda Negra's intent to create a security interest in Flores' accounts receivable. This evidence is, however, at best tenuous. The July 13, 1988, loan agreement was not part of the transaction that purportedly created the security interest in Flores' accounts receivable, nor was it between the same parties.

Nor is the February 18, 1988, memorandum of understanding between Flores and Mr. Frank Shannon particularly helpful. This document outlines the terms under which Mr. Shannon would loan $1,100,000 to Flores. The loan was eventually made to Flores by Banda Negra. It is somewhat unclear what interest Mr. Shannon has in Banda Negra. The loan was to be secured by "the assets of the company." Defendant's Ex. 18, p. 1. This single phrase is the only reference contained in this document that has any possible relation to the accounts receivable of Flores.

This Court finds that this reference to the memorandum of understanding, even combined with the reference to accounts receivable in the July 13, 1988, loan agreement to be insufficient to create a security agreement relating to accounts receivable under the composite document rule. This Court thus finds that Banda Negra possesses an unperfected security interest in Flores accounts receivable and, therefore, the interest of the debtor in possession to

these accounts receivable is superior to that of Banda Negra. N.M.S.A. § 55–9–301(1)(b).

## CONCLUSION

This Court finds that the total value of the assets sold at the October 5, 1989, auction was $900,000, the price paid for those assets by the successful bidder, Aldershot of New Mexico. This Court further finds that Banda Negra has a perfected security interest in all of the assets sold at that auction except the rose bushes. The value of the rose bushes is $100,000, the amount allocated to them in Aldershot's bid of September 6, 1989. Therefore, the value of Banda Negra's perfected security interest is $800,000, the total value of the assets sold less the value of the rose bushes.

Banda Negra does not possess a perfected security interest in Flores' accounts receivable as no security agreement relating to those accounts receivable exists. Thus, Flores' claim to the accounts receivable, as the debtor in possession with the powers of a trustee in bankruptcy, is superior to the claim of Banda Negra.

This Court has not addressed Count VI of Plaintiff's Complaint as the parties have agreed that all expenses listed therein are appropriate administrative expenses, with the exception of a claim for property taxes by Dona Ana County. As no evidence has been presented on that issue, it shall not be addressed by the Court.

Counsel for the Plaintiff is hereby directed to prepare a form of judgment, approved as to form by the counsel for the Defendant, in accordance with the opinion contained herein.

This memorandum opinion constitutes the Court's findings of fact and conclusions of law. An appropriate order shall enter.